IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TOM BROWN,<br><br>                Plaintiff,<br><br>   v.<br><br>APOLLO BOX, INC.,<br><br>                Defendant. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Tom Brown ("Plaintiff"), by and through undersigned counsel, seeks a permanent injunction requiring a change in Apollo Box, Inc.'s ("Defendant") corporate policies to cause its websites to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

**INTRODUCTION**

1. In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[1]

---

[1]     *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf) (last accessed Oct. 2, 2018).

2. Plaintiff is legally blind. He uses a screen reader to navigate the Internet.

3. Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at *6-7.[2]

4. Defendant is an online retailer that sells "unique, fun, and creative" products direct to consumers, including gadgets, fashion and beauty products, products for the outdoors, home, and office, apparel and shoes, toys, food, and more.[3]

5. Consumers may purchase Defendant's products at www.theapollobox.com and access other brand-related content and services at blog.theapollobox.com and ar.theapollobox.com ("Websites"), websites Defendant owns, operates, and controls.[4]

---

[2] *See also* American Federation for the Blind, *Screen Readers*, available at http://www.afb.org/prodBrowseCatResults.aspx?CatID=49 (last accessed Oct. 2, 2018) (discussing screen readers and how they work).

[3] Apollo Box, About Apollo Box, *available at* https://www.theapollobox.com/about (last accessed Oct. 3, 2018).

[4] Apollo Box, Terms of Use, *available at* https://www.theapollobox.com/termsofservice (last accessed Oct. 2, 2018) ("Welcome to www.theapollobox.com (the "Site" or "We"). This Site is operated by Apollo Box, Inc. ("Apollo Box" or "Company").").

6. In addition to researching and purchasing Defendant's products from the comfort and convenience of their homes, and arranging for home delivery, consumers may use Defendant's Websites to create personal accounts, track orders, sign up for Defendant's email list to "[k]eep up to date with updates and offers from Apollo Box," review important legal notices like Defendant's Privacy Policy, Shipping & Return Policy, and Terms of Service, and more.[5]

7. Defendant is responsible for the policies, practices, and procedures concerning the Websites' development and maintenance.

8. Unfortunately, Defendant denies approximately 8.1 million[6] Americans who have difficulty seeing access to its Websites' goods, content, and services because the Websites are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world.

9. Plaintiff brings this civil rights action against Defendant to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted

---

[5] Apollo Box, Home Page, *available at* https://www.theapollobox.com/ (last accessed Oct. 3, 2018).
[6] Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Oct. 2, 2018) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

10. By failing to make its Websites available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

11. Because Defendant's Websites are not and have never been accessible, and because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Websites to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

  a) that Defendant retain a qualified consultant acceptable to Plaintiff ("Web Accessibility Consultant") who shall assist it in improving the accessibility of its Websites, including all third party content and plug-ins, so the goods and services on the Websites may be equally accessed and enjoyed by individuals with vision related disabilities;

  b) that Defendant work with the Web Accessibility Consultant to ensure that all employees involved in website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

  c) that Defendant work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

  d) that Defendant work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

  e) that Defendant incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) that Defendant work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Websites, along with an e-mail address, instant messenger, and toll free phone number to report accessibility-related problems;

g) that Defendant directly link from the footer on each page of the Websites, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Websites to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Websites;

h) that Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) that Defendant provide a notice, prominently and directly linked from the footer on each page of the Websites, soliciting feedback from visitors to the Websites on how the accessibility of the Websites can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j) that Defendant provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Websites;

k) that Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Websites. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l) that Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Websites to be inaccessible to users of screen reader technology;

m) that Plaintiff, his counsel and its experts monitor the Websites for up to two years after the Mutually Agreed Upon Consultant validates the Websites are free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and its experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

12. Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

13. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14. Defendant attempts to, and indeed does so, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website, Defendant enters into contracts for the sale of its products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

15. As described in additional detail below, Plaintiff was injured when he attempted to access Defendant's Websites from his home but encountered barriers that denied his full and equal access to Defendant's online goods, content, and services.

16. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

17. Plaintiff is and, at all times relevant hereto, has been a resident of Westmoreland County, Pennsylvania. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

18. Defendant is a Delaware corporation with its principle place of business in Santa Clara, California.

## FACTS APPLICABLE TO ALL CLAIMS

19. While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

20. Defendant's Websites allow consumers research and purchase Defendant's products from the comfort and convenience of their own homes, and arrange for home delivery.

21. The Websites also enable consumers to create personal accounts, track orders, sign up for Defendant's email list to "[k]eep up to date with updates and offers from Apollo Box,"

7

review important legal notices like Defendant's Privacy Policy, Shipping & Return Policy, and Terms of Service, and more.

22. Consumers may use the Websites to connect with Defendant on social media, using sites like Facebook, Instagram, Twitter, and Pinterest.

## HARM TO PLAINTIFF

23. Plaintiff attempted to access the Websites from his home in Westmoreland County, Pennsylvania. Unfortunately, because of Defendant's failure to build its Websites in a matter that is compatible with screen reader programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access on the Websites. For example,

(a) Defendant's Websites do not provide text equivalents for non-text elements. Providing text alternatives allows information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. A person who cannot hear an audio file can have a text alternative displayed so she can read it. For example, buttons throughout www.theapollobox.com lack alternative text describing their purpose. Users who perceive content visually will likely recognize the Shopping Cart, Magnifying Glass, and Heart icons throughout www.theapollobox.com, and understand that by clicking them, Defendant will redirect them to the payment platform, search feature, and list of favorites, respectively. Unfortunately, these icons are not labeled. As a result, when Plaintiff hovers over the Magnifying Glass, for example, his screen reader reads "button end banner," only. Because this alternative text is meaningless, Plaintiff is less likely to take advantage of this important service.

(b) Defendant's Websites fail to provide alternative text for content whose meaning depends on consumers perceiving visual cues. For example, consumers who perceive content visually will notice that many products available for purchase on Defendant's Websites

8

include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. These users will likely infer that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, Plaintiff's screen reader cannot identify the meanings of these two fonts so that he can make an informed decision. Instead, Plaintiff hears two prices for the same product, and cannot determine what they signify, like different quantities, colors, sizes, or in this case, sales. This confusion prevents Plaintiff from making informed purchasing decisions, and increases the odds he will abandon the purchase process without making a selection.

(c) Defendant's Websites fail to distinguish elements that trigger changes (e.g. links and buttons) from non-actionable elements (e.g. content and status information) that do not. Providing a clear indication that elements are actionable is relevant especially where actionable elements are detected visually, for example, by changes in font or text color. Users who perceive content visually will see that many webpages at [www.theapollobox.com](www.theapollobox.com) includes text that reads, "How group sale works?" They will also note this text appears in blue font, and likely infer from this visual cue that by clicking the text, Defendant's website will redirect them to another webpage. Unfortunately, Defendant has not developed its website in a manner that enables Plaintiff's screen reader to similarly notify him this text is actionable. As a result, Plaintiff is less likely than others to activate this online feature to learn more about the discounts available in Defendant's Group Sales.

(d) Like many retailers, Defendant provides a five-star rating for each product on its Website. Users who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's Websites do not include alternative text communicating the number

of stars each product is rated. As a result, Plaintiff must make his purchasing decisions without the benefit of knowing whether the product he's considering is well received by other consumers.

24. These barriers, and others, deny Plaintiff full and equal access to all of the services the Websites offer, and now deter him from attempting to use the Websites. Still, Plaintiff would like to, and intends to, attempt to access the Websites in the future to research the products and services the Websites offer, or to test the Websites for compliance with the ADA.

25. If the Websites were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiff could independently research and purchase Defendant's products and access its other online content and services.

26. Though Defendant may have centralized policies regarding the maintenance and operation of its Websites, Defendant has never had a plan or policy that is reasonably calculated to make its Websites fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

27. The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

28. Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

**DEFENDANT'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS**

29. Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

30. Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

31. There is no DOJ administrative proceeding that could provide Plaintiff with Title III injunctive relief.

32. While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

33. Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

34. Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Websites, and (b) whether Plaintiff can access the content and services.

**SUBSTANTIVE VIOLATIONS**

**COUNT I**

**Title III of the ADA, 42 U.S.C. § 12181 *et seq*.**

35. The assertions contained in the previous paragraphs are incorporated by reference.

36. Defendant's Websites are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

37. In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its Websites, it has violated the ADA.

38. In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

39. Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

40. Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

41. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations

should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

42. By failing to provide its Websites' content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a) denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Websites;

(b) affording individuals with visual disabilities access to its Websites that is not equal to, or effective as, that afforded others;

(c) utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d) denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e) failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

43. Defendant has violated Title III by, without limitation, failing to make its Websites' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Websites, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

44. Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Websites to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

45. Making its online goods, content, and services compatible with screen reader programs does not change the content of Defendant's Websites or result in making the Websites different, but rather enables individuals with visual disabilities to access the Websites Defendant already provides.

46. Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

47. Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

48. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A) A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Websites are fully accessible to, and independently usable by, individuals with visual disabilities;

(B) A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Websites into full

compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Websites are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraph 11 above.

(C) A permanent injunction enjoining Defendant from continuing its retaliatory and coercive conduct;

(D) Payment of actual, statutory, and punitive damages, as the Court deems proper;

(E) Payment of costs of suit;

(F) Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(G) The provision of whatever other relief the Court deems just, equitable and appropriate; and

(H) An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: November 2, 2018

Respectfully Submitted,

*/s/ Benjamin J. Sweet*
Benjamin J. Sweet
bsweet@carlsonlynch.com
Kevin W. Tucker
ktucker@carlsonlynch.com
**CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322.9243

*Counsel for Plaintiff*